**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**AT LOUISVILLE**

Danielle CLEVELAND and
Dominique WICKER, as
co-administratrices of the
**ESTATE OF DARNELL WICKER**                                        **PLAINTIFFS**

**v.**                                                    **CIVIL ACTION NO. 3:16-CV-588-CRS**

**LOUISVILLE METRO**
**GOVERNMENT**, *et al*.                                                  **DEFENDANTS**

**MEMORANDUM OPINION**

## I.      Introduction

This case arises from an officer-involved shooting that resulted in the death of Darnell

Wicker. Wicker's daughters brought this lawsuit against the involved officers and the Louisville

Metro Government, alleging: federal civil rights violations based on the Fourth and Fourteenth

Amendments; state law assault and battery, wrongful death, and negligence claims; and a

municipal liability claim. It is before the Court on motions for summary judgment from all

remaining defendants. DNs 75, 76, 77. Ultimately, the Court will grant in part and deny in part

the motions for summary judgment. The motions will be granted as to the Fourteenth

Amendment § 1983 claim, the negligence claim, and the municipal liability claim. The motions

will be denied as to the Fourth Amendment § 1983 claim, the assault and battery claim, and the

wrongful death claim.

## II.     Legal Standard

A party moving for summary judgment must show that "there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P.

56(a). "[T]he mere existence of some alleged factual dispute between the parties will not defeat

an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A genuine issue for trial exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* In undertaking this analysis, the Court must view the evidence in a light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

The party moving for summary judgment bears the burden of establishing the nonexistence of any issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). They can meet this burden by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the . . . presence of a genuine dispute." FED. R. CIV. P. 56(c)(1). This burden can also be met by demonstrating that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## III.        Factual Background

Darnell Wicker was an Army veteran who spent 17 years in active service both domestically and abroad before being honorably discharged in 1997. *See* DN 80-2. Wicker, 56 years old, was deaf in one ear and could only partially hear out of the other. DN 80-4 at 3–4; DN 76-4 at 7. Recently, Wicker had taken up landscaping and mowing for local businesses, along with handyman jobs, to provide for himself and his long-time girlfriend, Anita Jones. DN 80-7 at 26–27. Their relationship had its ups and downs and on August 7th and 8th, 2016, it was having one of its downs.

On the evening of August 7, 2016, Anita was attending a barbecue at her daughter Danita's house. DN 76-3 at 3; DN 76-4 at 5. Around 10:30 PM, Wicker arrived and asked Anita

for a key to the apartment they shared. DN 76-3 at 3; DN 76-4 at 5; DN 80-3. Anita refused to give it to him and Wicker left. DN 76-3 at 3; DN 76-4 at 5. After the barbecue ended, Danita drove Anita back to her apartment. DN 76-3 at 3; DN 76-4 at 5. Arriving around 1:19 AM on August 8, 2016, they noticed Wicker's bicycle in front of the house. DN 76-3 at 3. Walking up to the door, they found that it had been kicked in and discovered Wicker in the kitchen cooking food. *Id.* at 3–4; DN 76-4 at 5.

Anita told him to leave and threatened to call the police. DN 76-3 at 3; DN 76-4 at 4–6. Anita claims Wicker responded "I don't care, let 'em come on." DN 76-4 at 6. At that point, Anita left the house and told Danita to call the police. *Id.* Wicker followed her outside, carrying a knife and an 18-inch pruning saw, which Danita claims he was "playin' with" in an "intimidating" manner. *Id.*; DN 76-3 at 3–4. As he approached them, shouting "you really wanna do this," Anita and Danita got in the car and locked the door. DN 76-3 at 4; DN 76-4 at 6.

Around 1:35 AM, the Louisville Metro Police Department (LMPD) received a "Domestic Trouble with Violence" call indicating that a man was armed with a knife and a saw. DN 76-5 at 59. LMPD dispatched two cars: one driven by Officer Brian Smith and the other driven by Officer Taylor Banks and carrying Officer Beau Gadegaard. Smith arrived first and activated his body camera. As he pulled up, Smith saw two women—Anita and Danita—flag him down. DN 76-6 at 4. Smith's body camera footage depicts him approaching them, as they tell him that Wicker is "in there with two knives and a saw." DN 81-1 at 00:57–01:04. They then relate the story of the afternoon as described by the Court thus far. From that information, Smith "established that a burglary occurred and the suspect was inside the apartment and armed" and determined to approach the apartment to perform an arrest. DN 76-6 at 59–60. While Smith was talking to Anita and Danita, Banks and Gadegaard arrived in Banks's cruiser. DN 76-5 at 9; DN

3

81-3 at 00:41. As Gadegaard exited the cruiser, he could see Wicker standing in the door of the apartment. DN 76-6 at 9. They made eye contact and Wicker moved back inside the apartment. *Id.*

Smith then began moving toward the apartment. *Id.* Gadegaard and Banks followed, running to catch up. DN 81-3 at 00:48–00:51. During that time, Smith reached a maximum speed of 5.4 miles per hour, Gadegaard reached a maximum speed of 5.9 miles per hour, and Banks reached a maximum speed of 8.0 miles per hour. DN 76-9 at 43. Smith drew his weapon and the other officers followed suit. DN 76-5 at 9; DN 76-7 at 4. As they approached, "Wicker came out the door." DN 76-6 at 7. At that point, the officers noticed that Wicker was holding the pruning saw in his right hand. *Id*. at 10; DN 76-5 at 12–13. Gadegaard stated he thought it was a sword or large knife. DN 76-5 at 13. The pruning saw was roughly 18 inches in length and designed to cut branches from trees. *See* DN 77-12 (exemplar). Wicker used it in doing landscaping for several local businesses. DN 80-7 at 26–27.

What follows is visible on Banks's body camera (DN 81-3) and the subject of a detailed analysis by Plaintiffs' forensics expert, Richard Ziernicki (DN 76-9).[1] Wicker is first seen on the video standing in the doorway 2.2 seconds before the first shot is fired. DN 76-9 at 24. Around 2.0 seconds before the first shot, the officers begin giving the command to "drop it" and "drop the knife." *Id*. at 4. At 1.8 seconds before the first shot, Wicker's left arm is seen up around shoulder height. *Id*. at 25. Wicker then lowers his left arm and begins to pull the door closed by the handle with his left hand. *Id*. at 26. At 1.3 seconds before the first shot, Wicker steps forward

---

[1] The Defendants agree to accept, for the purposes of ruling on summary judgment, the analysis, results, and conclusions of Ziernicki. *See* DN 77-1 at 7 ("For the purposes of this motion, Officer Banks will accept the findings of Richard M. Ziernicki . . . as the undisputed factual record."); DN 76-1 (referencing "Ziernicki report" and its conclusions throughout). This is proper, as the Court is required to take the factual record in the light most favorable to the non-moving party. *Scott*, 550 U.S. at 378. These do not represent findings of fact.

with his right leg onto the step immediately outside his door. *Id*. at 27. The pruning saw first becomes visible in Wicker's right hand 1.1 seconds before the first shot. *Id*. at 28. It can be seen in his left hand 0.37 seconds later. *Id.* At 0.5 seconds before the first shot, Wicker steps forward off the step with his left leg, planting his left foot on the welcome mat in front of the apartment. *Id*. at 30. At that moment, Wicker is moving at 1.6 miles per hour. *Id.* For reference, the average human walking speed is 3 miles per hour. *Id*. at 4. At 0.4 seconds before the first shot, Wicker's right foot comes off the step as he transfers all his weight onto his left leg, which remains planted on the welcome mat. *Id*. at 31. At that moment, Wicker is moving forward toward the officers at a speed of 1.3 miles per hour. *Id.* At 0.3 seconds before the first shot, Wicker brings his right leg forward and is about to touch the ground just in front of the welcome mat. *Id.* At that moment, Wicker is moving at 1.0 miles per hour with the pruning saw visible in his left hand and pointed downward. *Id.* at 31–32. Officer Gadegaard, then 15.9 feet from Wicker, opens fire. *Id*. at 4, 32.

At 0.2 seconds after the shot, Wicker pivots toward his left on his left leg and brings his right arm up, bent at the elbow, in what appears to be a reaction to the shot. *Id*. at 33. At that moment, Wicker is moving slightly backwards at 0.2 miles per hour. *Id.* At 0.4 seconds after the first shot, Banks, then 17.6 feet from Wicker, opens fire. *Id*. at 4. Within 1.7 seconds, Gadegaard and Banks discharge their firearms a collective fourteen times, emptying their magazines. *Id.* When Wicker returns into frame 6 seconds later, he is lying on his back on the ground just to the right of his doorway, bleeding profusely from his chest and back. *Id*. at 34.

There is a dispute about Wicker's behavior with the saw. Gadegaard testified that Wicker took an "aggressive stance" and began to swing the saw across his body, shaking it. DN 76-5 at 13. Banks similarly reported that Wicker was "swinging the knife back and forth and kind of shaking a little bit." DN 76-7 at 11. Smith concurred that Wicker "swiped" or "swung" the saw

across them as he moved, though not pointed at him in a focused way. DN 76-6 at 15. However, the video as analyzed by Plaintiffs' expert demonstrates that Wicker originally had his left arm around shoulder height while holding the saw in his right hand and, as he exited the apartment and shut the door, transferred the saw from his right hand to his left hand, which remained at his side, pointed downward. DN 76-9 at 25–29. Plaintiffs provide a re-creation of the action using motion capture. *Id*. at 38.

Gadegaard explained that he engaged when Wicker swung the saw across his body. DN 76-5 at 18. He testified that Wicker "looked like he wanted to kill" him, that Wicker's "jaw was clenched," he was "flexing," "looked tense," and made a noise he described as a "grunt." *Id.* Gadegaard claimed these actions made him feel "like I was in danger, like, for serious bodily injury and my partners' body and/or death, that's when I shot, after he did those actions." *Id*. at 19. Banks described his decision to fire in similar terms:

> Well, you got a guy that has a large tree saw in his hand that's advancing on you in an aggressive manner. I mean, one—I mean, I don't know what the guy—I don't know what he was thinking in his head. So, you know, I was in—I was in fear for my life. One swing of that thing can hit my partner in the neck, hit me in the neck, hit some sort of artery or anything like that with those teeth and give us—hit us in the eye, serious injury, I mean, anything.

DN 76-7 at 9–10.

Afterward, the police department conducted an internal investigation and the Commonwealth's Attorney's office conducted a review. During the internal review, LMPD Chief Steve Conrad determined that Gadegaard had violated LMPD's Standard Operating Procedure (SOP) regarding body cameras for failing to activate his camera before the encounter with Wicker. DN 75-11 at 1. However, Conrad determined that Gadegaard did not violate the SOP related to the use of force itself. *Id.* The latter determination was also made regarding Banks. *Id*. at 4. The Commonwealth's Attorney determined that "the actions of the officers were

consistent with the laws of the Commonwealth" and declined to review the matter further. DN 75-13 at 10.

## IV. Discussion

In the Amended Complaint, Plaintiffs bring six substantive claims.[2] *See* DN 30 at 10–12. First, under the federal civil rights statute, 42 U.S.C. § 1983, they claim that Gadegaard and Banks violated Wicker's Fourth Amendment right to be free from unreasonable seizures by utilizing excessive force. Second, also relying on § 1983, they claim that Gadegaard was motivated by race in shooting Wicker in violation of the Fourteenth Amendment's Equal Protection Clause. Third, they argue that Wicker's shooting was an unprivileged and nonconsensual touching amounting to a common-law assault and battery. Fourth, they argue that the officers' tactical plan was flawed and resulted in negligent conduct. Fifth, they claim damages pursuant to Kentucky's wrongful death statute. Sixth, they argue that Louisville Metro Government was aware of ongoing constitutional violations and was deliberately indifferent by failing to supervise Gadegaard. Defendants attack all remaining claims in their motions for summary judgment.

### A. Federal Civil Rights Claims Pursuant to 42 U.S.C. § 1983

A person who, under color of law, deprives another of their constitutional rights may be subject to liability. 42 U.S.C. § 1983. Section 1983 "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Graham v. Connor*, 490 U.S. 386, 393–94 (1989) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). To state a claim under Section 1983, "a plaintiff must set forth facts that, when construed favorably, establish (1) the deprivation of a right secured by the Constitution or laws

---

[2] An additional claim regarding the right to adequate medical care was dismissed following a 12(b)(6) motion. DN 44.

of the United States (2) caused by a person acting under the color of state law." *Burley v. Gagacki*, 729 F.3d 610, 619 (6th Cir. 2013). Plaintiffs have asserted § 1983 claims stemming from alleged violations of the Fourth Amendment and from the Fourteenth Amendment's Equal Protection Clause.

### i.    Fourth Amendment's Protection Against Excessive Force

Defendants assert that they are entitled to qualified immunity on the Fourth Amendment claim. It has long been established that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Therefore, there are two prongs which must both be met to overcome qualified immunity: (1) there was a constitutional violation and (2) the right violated was clearly established. The Court is permitted to address these in any order, but will consider whether there was a violation first, as "it often may be difficult to decide whether a right is clearly established without deciding precisely what the existing constitutional right happens to be." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (quoting *Lyons v. Xenia*, 417 F.3d 565, 581 (6th Cir. 2005) (Sutton, J., concurring)).

### a.    Violation

The Fourth Amendment's guarantee against unreasonable seizures protects an individual's right not to be subjected to excessive force in the course of an arrest, investigatory stop, or other seizure. *Graham*, 490 U.S. at 394. When analyzing whether an officer has acted unreasonably by using excessive force, the court should balance the interests and, in so doing, consider (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting

to evade arrest by flight. *Id.* at 396. However, "in excessive force cases, the threat factor is a minimum requirement for the use of deadly force, meaning deadly force may be used only if the officer has probable cause to believe that the suspect poses a threat of severe physical harm." *Jacobs v. Alam*, No. 17-2159/18-1124, 2019 WL 489060, at *7 (6th Cir. Feb. 8, 2019) (slip op.) (cleaned up). *See also Tennessee v. Garner*, 471 U.S. 1, 11 (1985) (deadly force is only reasonable "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others.").

Reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. The determination "must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97. As such, the reasonableness standard "contains a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case." *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002). However, such claims must be carefully examined when the officers utilize deadly force, as "[t]he intrusiveness of a seizure by means of deadly force is unmatched" and its use "frustrates the interest of the individual, and of society, in judicial determination of guilt and punishment." *Garner*, 471 U.S. at 10.

The parties give some limited discussion of the first and third *Graham* factors. It is uncontested that Wicker was not actively resisting or attempting to evade arrest. DN 76-1 at 23. It is also clear that Wicker had likely committed some crime. Defendants point to felony burglary and third-degree assault. DN 76-12 at 21–23. Even Plaintiffs' expert conceded that Wicker had likely committed at least criminal trespass or criminal mischief in the second degree. DN 76-13

at 11. However, the real issue in this case (and the one emphasized by *Jacobs*, *Garner*, and many other cases) is the second factor: whether the suspect posed an immediate threat to the safety of the officers or others.

Here, Wicker was armed with an 18-inch pruning saw. Such an implement certainly has the potential to be deadly, which Plaintiffs concede. DN 76-8 at 6; DN 77-13 (admission that "a pruning saw could, under limited circumstances, be used to inflict deadly harm"). However, the *manner of use* is much more important than the type of implement, as "merely possessing a weapon" does not provide the officer with probable cause to believe that the suspect poses a threat of imminent serious physical harm, either to the officer or to others. *Jacobs*, 2019 WL 489060, at *7 (citing *Bouggess v. Mattingly*, 482 F.3d 886, 896 (6th Cir. 2007)).

When a suspect armed with a bladed weapon moves close to the officers, repeatedly refuses to drop the weapon, and the officers have no means of escape, a reasonable officer would appreciate the danger of imminent physical harm and deadly force is permitted. *See Chappell v. City of Cleveland*, 585 F.3d 901, 911 (6th Cir. 2009) (no violation when the "knife-wielding suspect was undisputedly moving toward the officers and had closed to within five to seven feet in a dark, cluttered, enclosed space" and the officers "were backed up against a wall in the small bedroom and there was no ready means of retreat or escape"); *Rhodes v. McDannel*, 945 F.2d 117, 118 (6th Cir. 1991) (no violation where the suspect "advanced upon the officers . . . with a raised machete, despite several warnings to halt"); *Rucinski v. Cty. of Oakland*, 655 F. App'x 338, 341 (6th Cir. 2016) (no violation where the suspect brandished a switchblade knife, opened it, began moving toward the officers, disregarded repeated orders to drop the knife, and approached to within five feet). In those scenarios, had there been any hesitation by the officers,

"they would have been within his arm's reach and vulnerable to serious or even fatal injury." *Chappel*, 585 F.3d at 911.

The same holding does not apply when the officers fire immediately or when there is a larger distance between them and a blade-wielding suspect because the danger of severe bodily harm is not imminent. *See e.g. Chappell*, 585 F.3d at 915 (noting that the result might have been different "[i]f the detectives had fired immediately upon finding McCloud hiding in the closet with a knife"). For example, in *Lopez v. City of Cleveland*, 625 F. App'x 742, 744 (6th Cir. 2015), police shot a man who was holding a machete, standing within seven feet of another individual, and refusing to drop the weapon. The facts regarding his demeanor were disputed. The defendant officers had argued that he had lifted the machete above his head as if to harm the other person. *Id.* However, other evidence indicated that he only turned toward the person while holding the machete at his side. *Id.* This factual dispute was sufficient to preclude the court from determining that the officers acted reasonably. *Id.* at 746. The court distinguished *Chappell*, noting that it "presented a far more immediate threat of danger." *Id.* In *Lopez*, unlike in *Chappell*, there existed "a dispute of fact as to whether Lopez made any movement in those final moments that could reasonably be interpreted as threatening [anyone]." *Id.*

Similarly, in *Scozzari v. Miedzianowski*, 454 F. App'x 455, 458 (6th Cir. 2012), the officers claimed that Scozzari had raised a knife and a hatchet above his head and aggressively advanced on the officers until he came within ten feet of the officers and was shot. However, other witnesses disputed those facts. *Id.* 458–59. Again, the court distinguished *Chappell*, noting that there was evidence that "the Officers were standing 15 to 20 feet from Scozzari," who "was moving slowly or not at all," and held the weapons at his side, rather than over his head. *Id.* at

463. The court concluded that there existed "a genuine question whether the situation compelled a split-second decision to use lethal force." *Id.*

There has been some discussion in this case about a "21-foot-rule." Specifically, Banks points the Court to a 2014 interview given by Plaintiffs expert, Ron Martinelli. The interview and accompanying video demonstrate Martinelli's opinion that an officer faced with a knife wielding suspect within 21 feet will find it difficult or impossible to draw, aim, and fire their weapon. *See* DN 77-3; DN 77-4; DN 77-5. In the video, he remarks that, "throughout the United States, this is standard training." DN 77-3. Plaintiffs have introduced evidence that the "rule" is not really a rule, is taught in a decreasing number of police academies, and has been abandoned or modified by LMPD. DN 80-16 at 18. It is unlikely the "rule" would have any application to his case, as it is undisputed that the officers already had their weapons drawn, obviating the need to account for time to draw their weapons. Regardless, the evidence adduced by Defendants is insufficient to demonstrate a lack of a genuine issue of material fact. At best, it demonstrates that there *is* a genuine issue of material fact which would preclude summary judgment.

Wicker was also given very little time to comply with the commands to drop the weapon. Roughly two seconds elapsed between the first order to drop the weapon and the first shot. This is drastically different from the extended encounters described in *Lopez* and *Scozzari*. *See Lopez*, 625 F. App'x at 743–44 (three different attempts to utilize a taser and continued discussions between the suspect and his family); *Scozzari*, 454 F. App'x at 459–460 (multiple advances on the suspect's home, followed by repeated confrontations and discussion). The scenario presented here is more like the hypothetical discussed in *Chappell*:

> If the detectives had fired immediately upon finding McCloud hiding in the closet with a knife, their actions would certainly be held objectively unreasonable. Instead, it was McCloud's undisputed actions of quickly advancing toward the

officers while holding the knife up and refusing to drop it that precipitated their use of deadly force.

585 F.3d at 915 (emphasis added). Both Anita and Danita, the only other living witnesses, were convinced that Wicker was given an insufficient amount of time to comply. DN 76-3 at 6; DN 76-4 at 16. The Court has extensively reviewed the video from Banks's body camera and agrees with those witnesses that the shooting almost immediately follows the commands to drop the weapon, which was incorrectly said to be a knife, rather than the pruning saw Wicker actually had in his hand.

This case is much closer to *Lopez*, *Scozzari*, and the *dicta* from *Chappell*. The facts in the light most favorable to Wicker indicate that the officers, while standing 15.9 and 17.6 feet away from Wicker, repeatedly ordered him to drop the weapon (incorrectly identified as a knife), which he had not used or threatened to use, and opened fire almost immediately thereafter, despite the fact that Wicker was moving slowly. The Sixth Circuit has recognized that, "if there is some evidence—more than a mere scintilla of evidence—that [the suspect], through his conduct, judged from the perspective of reasonable officers on the scene, did not give the officers probable cause to believe that he [then] posed a serious threat of harm, a genuine fact dispute is created." *Chappell*, 585 F.3d at 909 (emphasis deleted). Sufficient evidence exists in this case to question whether the officers were justified in shooting Wicker, at least enough to preclude a finding of objective reasonableness of the officers' actions. Therefore, the Court concludes that there is a genuine issue of material fact as to whether officers violated Wicker's Fourth Amendment right against unreasonable seizures.

### b.     Clearly Established

Whether a right is clearly established "is judged against the backdrop of the law at the time of the conduct." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (*per curiam*). While the

Supreme Court "does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (*per curiam*) (cleaned up). "In other words, immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (*per curiam*)).

"It has been clearly established in this circuit for some time that individuals have a right not to be shot unless they are perceived as posing a threat to officers or others." *Jacobs*, 2019 WL 489060, at *7 (citation omitted). "This articulation of the *Garner* rule is clearly established even in situations with diverse factual distinctions." *Sample v. Bailey*, 409 F.3d 689, 699 (6th Cir. 2005) (collecting cases). However, the Supreme Court has noted that the general rules set forth in "*Garner* and *Graham* do not by themselves create clearly established law outside an 'obvious case.'" *White*, 137 S. Ct. at 552 (quoting *Brosseau*, 543 U.S. at 199). Instead, "specificity is especially important in the Fourth Amendment context, where the Court has recognized that '[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.'" *Mullenix*, 136 S. Ct. at 308 (quoting *Saucier v. Katz*, 533 U.S. 194, 205 (2001)). Use of excessive force is an area of the law "in which the result depends very much on the facts of each case," such that police officers are entitled to qualified immunity unless existing precedent "squarely governs" the specific facts at issue. *Id.* at 309 (quoting *Brosseau*, 543 U.S. at 201).

In searching for applicable precedent, the Court looks first to decisions of the Supreme Court, then to decisions of the Sixth Circuit and the courts within it, and finally to decisions of other circuits. *Cahoo v. SAS Analytics Inc*, 912 F.3d 887 (6th Cir. 2019). Here, both Plaintiffs and Defendants cite to several cases which they claim are sufficiently analogous to demonstrate

that the right is or is not clearly established. The Court examines the proposed cases, keeping in mind that "Plaintiff bears the burden of showing that defendants are not entitled to qualified immunity." *Chappell*, 585 F.3d at 907 (citing *Untalan v. City of Lorain*, 430 F.3d 312, 314 (6th Cir. 2005)).

Defendants contend that the Supreme Court's recent opinion in *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (*per curiam*) does away with the clearly established issue. In *Kisela*, police arrived on the scene after someone called 911 to report that a woman was hacking at a tree with a kitchen knife. *Id.* at 1151. They spotted the knife-wielding suspect standing within six feet of another woman. *Id.* A chain-link fence with a locked gate separated the women from the officers. *Id.* The officers drew their firearms and commanded the suspect to drop the knife at least twice. *Id.* The suspect "appeared calm" but did not acknowledge the officers' presence or drop the knife. *Id.* At that point, an officer dropped to the ground and shot her four times through the fence. *Id.* Less than a minute had transpired from the moment the officers saw the suspect to the moment the officer fired. *Id.* All three of the officers later said that at the time of the shooting they subjectively believed the suspect was a threat to the other individual. *Id.* In contrast, she said she did not feel endangered at any time. *Id.*

The Supreme Court determined that the case was "far from an obvious case in which any competent officer would have known that shooting . . . would violate the Fourth Amendment." *Id.* at 1153. Further, looking to "the most analogous Circuit precedent" the Court found that no caselaw in the Ninth Circuit clearly established that the officer shooting in such a factual scenario would violate a constitutional right. *Id.* at 1154–55. *Kisela* certainly has some level of factual similarity: both cases involved a knife-wielding roommate who did not heed the commands of police to drop the weapon. However, there are also important factual

dissimilarities. For example, the suspect in *Kisela* advanced within six feet of the bystander—10 feet closer than Wicker was to Gadegaard—and had approximately 58 seconds longer than Wicker to respond to the officers' commands. In such a scenario, *Kisela* does not provide much guidance.

Therefore, the issue is whether *Chappell*, *Scozzari*, and *Lopez* would have clearly demonstrated to the officers that their conduct was impermissible.[3] *Chappell* was clear that it would be "objectively unreasonable" for police to fire on a knife-wielding suspect when they first saw him and he had not moved in an aggressive way. 585 F.3d at 915. When a blade-wielding suspect is not "quickly advancing toward the officers while holding the knife up and refusing to drop it" deadly force is simply not authorized. *Id. Lopez* and *Scozzari* then further demonstrate the application of the rule laid down in *Chappell*.

*Lopez* noted that shooting would be impermissible when a suspect is standing still and holding a bladed weapon at his side, even when a bystander was within seven feet. 625 F. App'x at 744. This was because there was no immediate threat of danger. *Id*. at 746. Put another way, the officers lacked probable cause to believe that Lopez would imminently injure the officers or a bystander. However, *Scozzari* is truly on point and demonstrates most clearly that the officers in this case violated a clearly established right:

> Viewed in the light most favorable to Plaintiff, the evidence indicates that the Officers were standing 15 to 20 feet from Scozzari when they shot him. Further, Scozzari was 51 years old, 5'3" and 133 pounds, blind in one eye and hardly physically intimidating. Additionally, there are genuine issues of material fact whether Scozzari was wielding a knife and hatchet over his head. Further, there is evidence that Scozzari was moving slowly. According to Miedzianowski, Scozzari walked or took "a couple steps" in McGraw's direction; other witnesses recalled

---

[3] The Sixth Circuit permits finding clearly established law from unpublished cases. *McCloud v. Testa*, 97 F.3d 1536, 1555 n.28 (6th Cir. 1996). Such analysis is proper because the cases are "uncontroversial and establish no new precedent," instead providing "real-life examples to demonstrate" already clearly established law. *Id. See also* David R. Cleveland, *Clear as Mud: How the Uncertain Precedential Status of Unpublished Opinions Muddles Qualified Immunity Determinations*, 65 U. Miami L. Rev. 45, 71–74 (2010).

Scozzari moving slowly or not at all. In contrast to *Chappell*, the circumstances here present a genuine question whether the situation compelled a split-second decision to use lethal force. . . . Accordingly, the district court did not err in denying Defendant Officers qualified immunity with respect to Plaintiff's excessive-force claim.

454 F. App'x at 463.

The cases indicate that, on August 8, 2016, it was clearly established that an officer violates the Fourth Amendment by using deadly force on a subject more than 15 feet away who was moving slowly and, though holding a pruning saw, was not using or brandishing it aggressively. Here, taking the facts in the light most favorable to the Plaintiffs, the officers were between 15.9 and 17.6 feet away from Wicker when they fired, he did not raise the pruning saw at the officers or swing at them in an aggressive manner, and only took two steps towards the officers while moving one-third of a normal human's walking speed. A reasonable officer would have known that they were not entitled to shoot in that scenario. Therefore, the officers are not entitled to qualified immunity and the motions for summary judgment will be denied on that issue.

### ii.      Fourteenth Amendment's Equal Protection Clause

Plaintiffs' second federal claim argues that Gadegaard violated Wicker's right to "the equal protection of the laws." U.S. CONST., amend. XIV, § 1. This clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). As relevant here, it "prohibits selective enforcement of the law based on considerations such as race." *Whren v. United States*, 517 U.S. 806, 813 (1996). "Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977). Discriminatory intent need not be the only factor, but it must be a motivating factor. *Id.*

at 265–66. Disproportionate impact (as opposed to intent or purpose) is insufficient. *Washington v. Davis*, 426 U.S. 229, 239 (1976).

The facts taken in the light most favorable to Plaintiffs indicate that Wicker was black and that Gadegaard (along with Smith and Banks) were white. Gadegaard also had a prior use of force complaint involving a black woman who had been involved in a fight. DN 77-11 at 33–34. Further, twelve days prior to the shooting of Wicker, a black male complained that Gadegaard had threatened him, cursed at him, and challenged him to a fight at Victory Park in Louisville. DN 80-11 at 1. A video of the incident was provided to officers and posted online. *Id.* Gadegaard was found to be in violation of the SOPs regarding Courtesy and Warrantless Searches. DN 80-11 at 2. He was found not to have violated the SOP regarding Biased Law Enforcement Practices. *Id.* In response to the insinuation of a racially discriminatory motive, Gadegaard testified that he normally worked beats 3 and 5, which include Louisville's West End, an area with a predominantly black population and a relatively high crime rate. DN 77-11 at 40–41. Further, he argued many of the arrests were based on "shall arrest" warrants, which remove officer discretion. *Id.* at 40.

Plaintiffs, as part of their case, must demonstrate that Gadegaard acted with discriminatory intent or purpose, rather than merely a disproportionate impact. Such proof can arise as a result of a comparison to other similarly situated individuals or through affirmative proof of discriminatory intent. *Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 534 (6th Cir. 2002). *See also Swint v. City of Wadley*, 51 F.3d 988, 1000 (11th Cir. 1995) ("Absent some evidence of racially disproportionate arrests compared to the actual incidence of violations by race, there is no basis for inferring racially selective law enforcement."); *United States v. Bell*, 86 F.3d 820, 823 (8th Cir. 1996) ("To establish discriminatory effect in a race

case, the claimant must show people of another race violated the law and the law was not enforced against them."). Generally, statistics are offered to make that proof. *See United States v. Avery*, 137 F.3d 343, 355–57 (6th Cir. 1997) (discussing proof of discriminatory intent through statistics). However, "[o]nly in rare cases will a statistical pattern of discriminatory impact conclusively demonstrate a constitutional violation." *Id.* at 356 (citing *McCleskey v. Kemp*, 481 U.S. 279, 293–94 n.12 (1987)).

Plaintiffs declined to respond to the Defendants' motions for summary judgment on this issue. *See e.g. Keys v. Dart Container Corp.*, No. 1:08-CV-138-JHM, 2012 WL 2681461, at *7 (W.D. Ky. July 6, 2012) ("a non-moving party waives an argument by failing to address the argument in its response brief"). Further, they have only provided evidence that at times Gadegaard arrested, searched, and used force on black individuals. They do not introduce any evidence regarding the number of white individuals (or individuals of any other race, for that matter) Gadegaard arrested, searched, or used force on or otherwise provide evidence to indicate that Gadegaard's seizures of black individuals were excessive. A mere accusation is insufficient to survive summary judgment. Put another way, absent any evidence to demonstrate discriminatory intent or purpose, Plaintiff has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. As a result, summary judgment for Defendants is proper on this issue.

### B.     Assault and Battery

"Assault is a tort which merely requires the threat of unwanted touching of the victim, while battery requires an actual unwanted touching." *Banks v. Fritsch*, 39 S.W.3d 474, 480 (Ky. Ct. App. 2001). Like federal law, Kentucky has a system of qualified immunity "which affords

protection from damages liability for good faith judgment calls made in a legally uncertain environment." *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001). Qualified official immunity applies to the negligent performance by a public officer or employee of (1) discretionary acts or functions; (2) in good faith; and (3) within the scope of the employee's authority. *Id.* Once a defendant asserting qualified immunity makes a *prima facie* showing that the act was discretionary and made within the scope of his authority, the burden shifts to plaintiff to establish that the discretionary act was not performed in good faith. *Id.* at 523. Bad faith "can be predicated on a violation of a constitutional, statutory, or other clearly established right which a person in the public employee's position presumptively would have known was afforded to a person in the plaintiff's position." *Id.* As a result, this analysis mirrors the federal qualified immunity inquiry. *Jefferson Cty. Fiscal Court v. Peerce*, 132 S.W.3d 824, 837 (Ky. 2004).

Even assuming *arguendo* that the officers' decision to shoot was discretionary and that it was within the scope of his authority, qualified immunity is still unavailable, as Plaintiffs have shown bad faith. As discussed in (IV)(A)(i), *supra*, taking the facts in the light most favorable to the Plaintiffs, the officers violated a clearly established constitutional right. Under Kentucky law, this demonstrates bad faith and vitiates the qualified immunity defense. That showing is also sufficient to create a genuine dispute of material fact as to whether the officer used unnecessary force in the seizure, committing an unprivileged assault and battery.

### C. Negligence

Plaintiffs' negligence claim involves the actions leading up to the shooting. On this issue, all parties agree that *Haugh v. City of Louisville*, 242 S.W.3d 683 (Ky. Ct. App. 2007) governs. In *Haugh*, a SWAT team stormed the suspect's residence, resulting in his death. *Id.* at 685. The court noted that the plaintiff's retained police expert testified that the arresting officers could

have made different tactical choices. *Id.* at 686. However, the court concluded that the officers were entitled to qualified immunity because their decision was based on "a good faith judgment call made in legally uncertain circumstances." *Id.* As discussed in (IV)(B), *supra*, the officers are entitled to qualified immunity if the act was discretionary, made in good faith, and within the scope of the employee's liability. *Yanero*, 65 S.W.3d at 522.

It is clear that the decision of the officers to advance on a subject's home is a discretionary act within the officers' duties. *Haugh*, 242 S.W.3d at 686–87. Therefore, the burden falls on Plaintiffs to demonstrate that it was not clearly established that the officers could not advance. For that proposition, they cite no cases. Indeed, the Plaintiffs' own police practices expert noted that Smith would have been the "officer in charge" so it was proper for "the other officers, without having any conversation with Smith, [to] just basically follow Smith." DN 80-15 at 18. Further, the facts taken in the light most favorable to Plaintiffs indicate that the police had received a call that a man inside was wielding a knife and saw. As they arrived, they saw Wicker moving in and out of the apartment. At that point, the officers determined to approach and arrest Wicker. It was only once they began advancing that Wicker exited the apartment. *See e.g.* DN 76-7 at 7 (Gadegaard explaining that Wicker emerged as the officers approached); DN 76-9 at 24–30 (Martinelli's analysis describing Wicker emerging from the apartment as the officers' approach). Like *Haugh*, the decision of the officers to advance on the house was a good faith judgment call made in legally uncertain circumstances and they are entitled to qualified immunity.

### D.     Wrongful Death

Kentucky's wrongful death statute permits the personal representative of a person's estate to seek damages when the death is a result of "an injury inflicted by the negligence or wrongful

act of another." KY. REV. STAT. § 411.130. This action can be coupled with personal injury actions brought on behalf of the decedent. KY. REV. STAT. § 411.133. Defendants' only argument that summary judgment is warranted on this issue is that the officers did not commit the underlying torts. Since the Court has found that the officers are not entitled to summary judgment on the substantive, underlying tort claims, they are similarly not entitled to summary judgment as to the wrongful death action.

### E. Municipal Liability

When analyzing a § 1983 claim against a municipality, there are two steps to the inquiry: "(1) whether plaintiff's harm was caused by a constitutional violation, and (2) if so, whether the city is responsible for that violation." *Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992). As discussed in (IV)(A)(i), *supra*, taking the facts in the light most favorable to the Plaintiffs, the officers violated a clearly established constitutional right. As to the second prong, the Supreme Court's decision in *Monell v. Department of Social Services*, 436 U.S. 658 (1978) leads the inquiry:

> [T]he language of § 1983, read against the background of the same legislative history, compels the conclusion that Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort. In particular, we conclude that a municipality cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory. . . .

> We conclude, therefore, that a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

*Id.* at 691–95. The Plaintiff must also demonstrate that the "deliberate conduct" of the municipality was the "moving force" behind the alleged injury, i.e., that there is "a direct causal

link between the municipal action and the deprivation of federal rights." *Bd. of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 404 (1997).

Plaintiffs specifically make a failure-to-supervise claim focused on Gadegaard. *See* DN 80 at 36 ("In this case, Plaintiff has presented facts to support a Louisville Metro custom or practice of failing to supervise Defendant Gadegaard in his use of force."). This is a proper claim, though admittedly "a rare one" which is almost never proved. *Amerson v. Waterford Township*, 562 F. App'x 484, 491–92 (6th Cir. 2014). To prevail on a failure-to-supervise claim, Plaintiffs must prove (1) the supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury. *Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006).

The facts in the light most favorable to Plaintiffs indicate that Gadegaard had 11 use of force incidents in the year preceding March 2016. DN 80-9. Plaintiffs' expert Lou Reiter testified that trend, along with his consistent failure to utilize his body camera, "made it foreseeable that he would continue to use more force than appropriate and would fail to use his [body camera equipment] when encountering field situations that required its use, specifically when using force." DN 80-20 at 14. As to LMPD, he concluded that "[t]he failure to supervise him on these critical police tasks put members of the public needlessly at risk." *Id.* In addition, Plaintiffs note that LMPD did not require drug or alcohol tests done on officers or institute a system for officers who "may be having some issues." DN 80-10 at 49, 55.

Assuming *arguendo* that LMPD had an inadequate system of supervision which caused the injury, the facts put on by plaintiff are simply not the proof required to find deliberate indifference by a municipality. Deliberate indifference is "a stringent standard of fault, requiring

proof that a municipal actor disregarded a known or obvious consequence of his action." *Brown*, 520 U.S. at 410. Failure to rigorously uphold the standard causes the entire scheme of municipal liability to collapse into a system of *respondeat superior*. *Id*. at 411. The Sixth Circuit in *Berry v. City of Detroit*, 25 F.3d 1342, 1355 (6th Cir. 1994) examined several cases on the question of deliberate indifference in factually analogous scenarios:

> In *Spell*[ *v. McDaniel,* 824 F.2d 1380 (4th Cir. 1987)], the plaintiff's evidence consisted of seven lay citizens testifying about brutality complaints they filed that resulted in no corrective action; eight present or former officers of the city police department testifying about a "code of silence" within the department and training in inappropriate methods of subduing suspects; an assistant state district attorney who had investigated and prosecuted officers for the use of excessive force; the former legal advisor to the police department who testified that he left the department because of an attitude favoring the use of excessive force; and internal records of the city police department showing frequent complaints about excessive force that were consistently dismissed or disregarded.

> In *Fiacco v. City of Rensselaer,* 783 F.2d 319 (2d Cir. 1986), . . . the plaintiff offered evidence that the city's public safety board had adopted rules relating to police discipline, but that the police chief never had seen them. The rules required complaints to be in writing, yet did not provide a form for civilians to make a complaint. No hearings were held by the public safety board in the five years prior to the plaintiff's injury at the hands of the police. Additionally, the plaintiff called as witnesses four of the six citizens who had actually lodged complaints against officers. Each citizen testified to being physically abused by an officer and complaining to the chief of police. The chief investigated the complaints on his own by simply talking to the officer involved. No investigatory file was created, no formal statement or disciplinary action was taken, and there was not even so much as a note placed in the officers' personnel files.

> In *Zuchel v. The City and County of Denver*, 997 F.2d 730 (10th Cir. 1993), the plaintiffs' expert "supported his opinion that the training program was inadequate with specific deficiencies supported by the record." *Id*. at 739 n. 4. Prior to the incident in which the plaintiffs' decedent was killed, the Denver district attorney had sent a letter to the police chief discussing the recurring incidents of the use of deadly force by Denver police officers, including five incidents over the previous six weeks where citizens were injured or killed and one in which an officer was seriously injured. The letter made numerous suggestions for improving the training in this area. The plaintiffs presented evidence that even after receiving this letter the police department made no effort to improve its training practices.

More recently, in *Ellis*, plaintiffs introduced ten incident reports detailing abuse of students by substitute teachers. 455 F.3d at 701. The Court concluded that the reports were insufficient to demonstrate deliberate indifference, as they were limited in number and only two rose to the level of the abuse alleged in the underlying claim. *Id.* "To establish deliberate indifference through these reports," the Court concluded, plaintiffs "would have had to allege and put on some evidence that two incidents of abuse over two years is an excessive number." *Id. See also Berry*, 25 F.3d at 1354 (directing the court should consider "more than raw numbers" and look to "information surrounding the actual circumstances of the incidents").

Therefore, Plaintiffs in this case would need to demonstrate that 11 use of force incidents were sufficiently "excessive" to put Louisville Metro on notice of ongoing constitutional violations and that there were indications of excessive force in those reports. However, Plaintiffs have offered none of that evidence. None of the incident reports cited by Plaintiffs contain the use of lethal or deadly force, none of them concluded that the force used was unjustified, and no context was provided as to whether that number of reports was truly excessive. Since Plaintiffs have "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment is proper. *Celotex*, 477 U.S. at 322.

## V.        Conclusion

The use of deadly force frustrates the individual's fundamental interest in their own life, as well as the interest of society in a judicial determination of guilt and punishment. However, the law recognizes that police officers in the field are called on to make quick decisions in uncertain and dangerous environments. For that reason, qualified immunity is available to protect the officers to the extent that they do not violate rights of which a reasonable officer would have

been aware. However, that discretion and deference is not unending. In this case, Plaintiffs have demonstrated a genuine issue of material fact as to whether the Defendants used excessive force against Darnell Wicker in the morning hours of August 8, 2016. Under the facts presented and applicable caselaw, a reasonable officer would have known that he was not entitled to shoot. For that reason, the Court will deny the motions for summary judgment as to the Fourth Amendment § 1983 claim, the assault and battery claim, and the wrongful death claim.

However, Plaintiffs have failed to make a showing sufficient to establish that Gadegaard acted with racial animus as a motivating factor, that the officers were on notice that their tactical decisions were flawed, or that Louisville Metro Government was negligent in supervising its officers. As a result, the Court will grant the motions for summary judgment as to the Fourteenth Amendment § 1983 claim, the negligence claim, and the municipal liability claim.

A separate order will be entered in accordance with this opinion.

March 6, 2019

**Charles R. Simpson III, Senior Judge**
**United States District Court**